May it please the Court, Ted Frank IV, Cross Appellant and Cross Appellee Frank Bednarz. Welcome back everybody, our second time around here. Thank you and thank you for holding a special session for us. Absolutely. We raised three different issues, two relating to their fees and one relating to our fees. First of all, the District Court erred in failing to follow Vizcaíno and Optical Disc, in failing to consider the proposal, the bid proposal as evidence of the ascertainable market rate. The District Court instead said, well, I didn't accept the bid, I didn't consider the bid, therefore it's not relevant. But again, it's the proposal that's relevant, not the acceptance of the bid. Vizcaíno, excuse me, Optical Disc is not a case about estoppel, it's a case about evidence. A bid proposal is evidence of the ascertainable market that Vizcaíno talks about and is the starting point for where the Court should mark the attorney fee rate. Was she required to do that, to consider Hagan's bid? Yes. That's our argument. Optical Disc says that it's an abuse of discretion to depart from the bid based on circumstances that were known at the time of the bid because the District Court has a fiduciary duty to the class and it's the proposal that matters. I guess one question I had, I understand your argument and why it could make some logical sense for the judge to use that, but I thought in Optical Disc that they were basically saying, yes, you should look at that when the bid was actually the basis for the appointment. And we don't have that situation here. Do you have a case that's more analogous to your situation? Well, there's no case in either direction on that. There's no case with an unaccepted bid where the Court said you have to consider it. There's no case with an unaccepted bid where the Court says it's okay not to consider it. But you would like us to say that. Well, I think that that's what Vizcaíno says and I think that's what Optical Disc says. And I agree Optical Disc involves an accepted bid, but there's no economic difference between an accepted bid and an unaccepted bid. We sent this back to the judge. What should the judge do? I mean, she was well aware of the bid. She explained why she didn't think it was relevant, that she didn't take the bid from a single firm, that she thought it was over the objections of the firm that wished to be the sole representative for the class, that she would rather have a tripartite structure to this. What's the gain by sending this back to a court who was well aware of what the circumstances were? Well, first of all, all those circumstances were known when the bid was made. So that's not, under Vizcaíno, under Optical Disc, that shouldn't make a difference. It's the proposal that matters, and Optical Disc says it's the proposal that matters, not the acceptance. Optical Disc is not a case about estoppel. It's a case about evidence. And Vizcaíno says when there's an ascertainable market, you start with the ascertainable market. It's the starting point, and that's what Optical Disc says. Right, but what I'm asking is, the judge is well aware of that. The judge hasn't missed something here. The judge is well aware of what the opening bid by a single law firm was, and she chose to do something different. So is there an abuse of discretion now? If she rejected that as a starting point, if she rejected the evidence, is there an abuse of discretion? We have to tell her to do what? Well, she says, I'm not even using it as a starting point. It's irrelevant, and that's incorrect. It is relevant. It's the starting point. Then she can decide whether there are circumstances not known at the time of the bid that are a reason to depart from the bid. We don't think there are any, but if the parties can argue for some, and they don't argue for any here, everything they mentioned was known at the time of the bid, and it was a very sophisticated bid by a very sophisticated law firm that this could be done for $20 million instead of $40 million. We're entitled to that starting point and that presumption, because as the optical disk says, it's an abuse of discretion to depart from that if there aren't facts that weren't known at the time because the court has a fiduciary duty to the class. The second error with respect to the fees was we argued that class counsel had a conflict of interest when arguing for a 90-10 distribution instead of a 100-0 distribution, and an earlier conflict of interest when it argued for a pro rata distribution. It argued against the interest of repealer state class members, and then this court recognized it was arguing for, that the plaintiffs were arguing for a pro rata distribution in its first opinion. And that's just a fundamental conflict of interest. Well, Mr. Frank, I don't want to interrupt where you're going to go, but I need to understand something. I thought that at bottom the 90-10 distribution wasn't challenged here, but that you're looping back your attorney fee argument to when the 90-10 was actually adopted. Am I wrong about that? We're challenging the attorney's fees under Rodriguez because of the conflict of interest, and the district court had an obligation to consider the conflict of interest and consider whether to dock the attorney's fees accordingly. Okay, so, but going back to my question, I actually thought that the 90-10 wasn't in and of itself challenged. We are not challenging the 90-10. Okay, I just wanted to make sure I understood. Because that's an abuse of discretion standard. Right, and I wanted to make sure I understood your brief correctly, and it appears I did, so thank you. So we are only challenging the legal error where the court said there was no conflict of interest, and the court based its decision that there was no conflict of interest by saying the Ninth Circuit was wrong. I didn't decide that this was pro rata. You had no business deciding that appeal. The appeal was premature, and that's just simply not what the unambiguous order the court made said, and the court recognized this in the initial appeal. So the court's decision is based on a faulty premise, and the conflict of interest is clear because class counsel cannot simultaneously argue for the maximum distribution to repealer state class members at the same time that it's arguing for the maximum distribution to non-repealer state class members. Well, we don't know what precisely went on in settlement, but the impression you get from reading the record is that ending the litigation with some small portion going to the repealer state plaintiffs was instrumental in obtaining a settlement. Am I wrong about that? Well, that's not what the neutral found, and that's a 2 ER 263 to 271, and the neutral found that those non-repealer state claims were quote-unquote worthless and that they could not have contributed to the whole value of the settlement. And, you know, perhaps if there was separate representation, a separately represented non-repealer state could have negotiated some small sum for that, but we will never know because there wasn't that separate representation, because there was that conflict of interest. So you're talking about Judge Westerfield as the? I believe that's who the neutral was. So I thought that there was, you know, a fair amount of analysis that went back and forth and everybody arguing and disagreeing, but that's what was recommended by the neutral was the 90-10.  No?  No, the neutral recommended 100-0, and if the district court found in the alternative that the non-repealer state claims had some litigation value, then 90-10. And class counsel took that 100-0 recommendation and went to the court and asked for 90-10 against the interest of the repealer state class members. And all we ask is that 10% difference, which is $8 to $11 million, that the repealer state class members not be punished for that. We're not asking to throw out the whole settlement. We're saying you can fix this by finding the conflict of interest that Rodriguez penalizes, and in Rodriguez they struck down, they zeroed out the attorney's fees for a conflict that was much, much, much less important and didn't affect millions of dollars. What are you asking? We're asking for that decision to be vacated, for this court to find that there was a conflict of interest, and for the lower court to then make findings over what the appropriate fee award is based on the conflict of interest that penalized the repealer state class members. Very quickly, the least significant issue is our own fees. The district court found that there was a $10 million benefit to the repealer state class members, but said there was not a common benefit because the common fund as a whole wasn't increased. And that's just a complete misunderstanding of common benefit law. There is an identifiable group that benefited, that's the repealer state class members, and they benefited by a quantifiable number, the $10 million that the district court found, and that nobody disputes was $10 million. And the fact that that's a redistribution doesn't matter, that we objected on behalf of those class members, and we won $10 million for those class members, and it was a quantifiable benefit, and we asked for a very modest 9% of that. Counsel, before we take on, I think, the merits of this, I think that we probably need to figure out whether your appeal was filed late. Thank you, Your Honor. The first appeal was filed on December 31st. That gave us, under Rule 4a.3, two weeks to file a cross-appeal, which we did do on January 14th, and that was timely. There was this incoherent filing on January 6th by the pro se that we feel has no legal effect and didn't even, as we know, didn't even fully withdraw the appeal of our attorney's fees because he says, I'm withdrawing the appeal to HLLI, but the court didn't grant fees to HLLI, it granted fees to Bednar's. And we had no way of knowing that he wouldn't come back and say, no, no, no, I am appealing those fees, this guy changes his minds a lot of the time, and it doesn't matter because 4a.3 is first. The word is first, and we say first means first. It didn't stop being the first appeal just because the appellant did something afterwards. You still had five days at the point that he filed his amendment to come within the original time for filing. You waited until the last day and then filed very late in the day, am I correct? Did you file at 1158? That's correct. Okay. That had the effect, perhaps, of precluding the cross-appeal. I mean, there's a little bit of gamesmanship going on here because if your appeal time is timely on January 14th, then the IPP's cross-appeal on January 27th is late. Yes. And their remedy was to go to the district court? Their remedy is to ask for relief under 4a.5. Which is going to the district court and pleading for a clause. That's correct. And they had 30 days to do that, and they didn't do that. But we quite frankly thought that class counsel was going to cross-appeal at the last minute on January 14th also, and they happened not to, but we've been a victim of that timing before in other cases. If the court has no immediate questions, I'd like to reserve time for rebuttal. Thank you. Thank you. Good afternoon, and may it please the court. Kevin Green for the Plaintiff Appellant Indirect Purchasers. The last time we were all gathered here, counsel for Mr. Bednarz said that if the allocation had turned out to be 9 to 10, he would probably conserve resources and not challenge it, and that highlights in going to some of the questions in the opening of, I think, setting the table for the issues just briefly of what is not challenged here, because the most prominent objections in class action settlements are not presented here. There's a settlement for $113 million. Can you move the mic a little closer to you? Sure. Just tip it up a bit. Sure. Is that better? Yeah. And speak up like you're talking to junior high school class. All right. All right. There's a settlement for $113 million. That amount is not contested as inadequate. That's a very common objection. There's no objection now to the 9 to 10 allocation, which is a common objection of other class members are getting more than me, and there's no objection to the attorney's fees, at least under the usual arguments of the percentage of the fund is too high, Lodestar, so on and so forth. So instead we've got distinct issues that are really just a morphing from, I think, an argument that he said he was not going to make, trying to put it into an attorney fee box where it doesn't fit and frankly would require new law or untenable extensions, particularly of optical disk, that you simply can't get there from here, and I'd like to address that. Didn't our panel pretty clearly tell the district court to determine whether there was a conflict and then proceed from there? I think the panel directed the district court to make more detailed findings, and it took that hint, and then in the round three settlements that were affirmed by this panel last year, this court affirmed the 9 to 10 allocation and held that the differential allocation of 9 to 10 between repealers and non-repealers was equitable and not an abuse of discretion, both as a matter of adequacy under Rule 23A4 and substantive fairness. Okay, I don't know whether that's preclusive, but it's highly persuasive, and both can be in the same class without a conflict. I don't understand why that doesn't really come close to deciding it. She could have said, following the Ninth Circuit opinion, I've looked at the conflict issue, and I've determined it has no impact at all on these proceedings and gone forward, couldn't she? Under pro rata? Yeah. I don't think that was ever the intent. She could have done that. The 2019 decision simply held that we need a more fulsome analysis, no judgment on what type of plan of allocation. She did that fulsome analysis, did she? Yes, of course she did. And then she ultimately concluded to allocate 9 to 10 as to all three settlement tranches. And that highlights a part of the process that I want to get to that shows that there's an effort to portray this as underhanded or bad faith litigation. I didn't hear that argument from your opponent. As a conflict of interest. I heard that. Okay. Well, when we got to the third round settlements, we involved a neutral, Judge Westerfield, and there were separate counsel, different firms, not ours, and I'm joined today by Leif Cabraser and the Kachet firm co-counsel, of different firms that made presentations to the neutral who did make the recommendation that 100-0 or 90-10. And then this court in the round three appeals upheld that, which is substantially indistinguishable from what we have here, at least as a matter of conflict analysis. So I don't see how there could be a conflict, given that holding especially, that could. And, again, we're not talking about a challenge to the settlement, but somehow reduce the attorney's fees. Under what theory? Under Rodriguez, where there were side deals with class representatives, which are considerably problematic and led to a reversal in that case. But this is all good-faith litigation, ebb and flow of class actions on the allocation plan, the role of an objector who sought and was paid attorney's fees, that is challenging now, and leading to an outstanding and fair result, certainly within the district court's discretion. Well, something, you know, it's like we're going in circles because the Ninth Circuit panel, we, we're the Ninth Circuit panel, said, you know, there appears an apparent conflict of interest. Then we have Judge Westerfield involved, and we do get the 90-10 split, correct, which is not in and of itself challenged here, according to Mr. Frank, right? That's clearly not challenged. That's correct. So then the question is, if that split is not challenged, then does it follow that the attorney's fees follow that split, or is there another step that the district court needed to take to analyze whether in collecting fees there was a conflict? The only steps that I think are before us now are the role of the bid and this conflict argument that the opposing side is making. So, and the district court took a very careful look at the bid. It said, I need to do a complete reanalysis. That's at SCR 46 of the role of the bid. And she did that. And if I could just talk about the bid for a minute, because my firm is counsel in the optical disc. We know that case. It makes all the difference in the world that the bid in that case was accepted and not rejected. The holding of the opinion, I think at page 935, is we hold it where lead counsel secures appointment based on a competitive bidding process. That bid becomes the starting point for a reasonable fee. Well, you can understand that, and even then there's some discretion to go up or down. But what happened here? There was a bid by one firm out of a number of competitors almost 10 years ago. The district court says, I'm rejecting that bid. We have all these mega law firms here that you're going to be up against. I think one firm is insufficient. You three firms, including my co-counselor, who are competing, I want you to work together. I'm going to appoint you to lead the case. And then the litigation went forward on that basis, and nobody challenges that it was within the district court's discretion to proceed in that way. And in fact, bids are quite exceptional. There was a heyday for bids. It really has come and gone. And so the district court appointed lead counsel, co-lead counsel, and all the attorneys representing the class relied on her orders in litigating the case and not that bid. And there are some other factors with the bid that are distinguishing that I think are important. My opponent really overstates the holding not just of optical disk but of Vizcano because there's a passage in Vizcano and I think it says that a bid may be probative under the circumstances, may be probative. And the district court looked at that bid and as thoroughly as it could have done, it stopped the press and considered, does this have any impact on the fees? If this case were to go back, what would the judge say or do that the judge hasn't already done in relation to the bid? It simply didn't have any bearing on it and it would be really unfair to co-counsel who did not make the bid, did not support the bid, did not even see the bid until 2020 because it was under seal for this somehow to impact their attorney's fees. Now, on the conflict of interest argument, there's some suggestion that the non-repealers never had any rights to start with and so it even could have been 100-0. And there's one twist on this record that it's in the briefs, but this is a great thing about argument to put a little emphasis on it. The district court denied second-class certification including certifying a class nationwide under California law which would have included the non-repealers and that was retained as a potentially appealable issue. That's something that they gave up as part of the release and being part of the settlement. So I think particularly when you consider that a plan of allocation doesn't have to be just one way, it's on a range that 90-10 consistent with the Round 3 affirmance and the Round 3 decision is entirely fair. I want to say just a few words about the process that occurred here because I'm hoping that this really is a retrospective on lengthy litigation that all arguments have been exhausted and heard and it's time for this case to conclude. As we look back, the process really vindicated the district court's approach of appointing the three firms. We worked together to recover an amount that was by my memory never challenged as inadequate in the face of class certification denied twice so you don't have that leverage and force against the defendants. And I have to say, working with my co-counsel here, I think my firm would have done a wonderful job, but it was done entirely in a professional and collegial way and we made the arguments better because of it. We disagreed at times. I'm going to peel back the curtain for just a minute on some of what happened on our side. We disagreed at times, but it was always in the interest of robust debate to get to the strongest argument for the class. And that was a professional pleasure for me and everybody involved, and I think it really vindicated the district court's observation at SCR 47 that had I been able to do it over again, I wouldn't appoint just one firm to lead this case. So again, why would we send this case back? This is a good result. This is how class actions should work. And I want to add to that that the district court, I can't imagine what her lodestar is for this case, but she oversaw a massive MDL and did a spectacular hands-on job using the tools of Rule 23 and the active role of the trial judge under Rule 23 to oversee the proceedings and lead to this conclusion. She does make the finding that there's no interclass conflict, no breach of fiduciary duties. But then she also has a phrase in here about counsel being zealous advocates, and I'm not sure what's the link between those, because you can be a zealous advocate, but there still could be a conflict of interest, for example. So what I think the more difficult question here is not the reference to Huggins-Berman's initial bid, but rather when we get to this part of the case, when 90-10's basically been approved and now waived as a challenge, whether she did enough to determine whether there was a conflict for the fee award. And that's really, to me, kind of the nut of the appeal. So if you could address that point particularly, it would be helpful. I think her findings on that are more than adequate and should be looked at in the context of her immersion in all the proceedings. She was completely aware of all this. And again, the Round 3 opinion said you could have 90-10 and it's a potential conflict that is mitigated by the 90-10 allocation. And so it boils down to can you have repealers and non-repealers in the same class? There's no case there was not before, there is not now. It says that categorically you cannot do so. And that really gets to an important point as to why there was a national class here. This was a national, factually, a case where the antitrust wrong had a national impact in every state. And so it was really integral to the defendants to settle this case practically if we were going to get to a resolution that it was going to be nationwide in some fashion. So it's, I think, within her discretion and consistent with this court's opinion in Round 3 that there isn't a conflict for purposes of a settlement class at 90-10. Boiled down. Counsel, would you turn to the jurisdictional question for just a minute? I asked Mr. Frank several questions about whether his cross-appeal was timely. I wonder if you want to weigh in on that question. Sure, sure. We didn't go heavy on that initially because the court can, of course, always does evaluate its own jurisdiction as to timeliness, but we made that argument and preserved it in our opposition to his motion to dismiss the appeal. And I don't think we're dealing with a messy pro se that didn't know what he was doing. That's not the issue. He filed a one-page notice of appeal that was amended as he had the right to do that said, I'm no longer appealing the fees awarded to Mr. Bednarz. That was crystal clear. And that was five days before the deadline to appeal. Yeah, although the rule seems pretty clear that you get 14 days after the first notice of appeal is filed, which would have made this order filed at the last minute. I gather that's not an unusual practice, but it would have been filed on the 14th day. That would make your cross-appeal untimely. And your remedy would have been to go to the district court. Well, I don't think it is, and this has been briefed thoroughly and my time is expiring, so I'll rest on the briefs. Please just answer the question. Sure, sure. We've got a couple of arguments on that. There's not just the machinations of Rule 4A3, but Mendocino County is very clear that a cross-appeal under Ninth Circuit law is a rule of practice and can be waived in the court's discretion if you were to get there. But there's a case from the Fifth Circuit called Lee that's cited in our briefs that I think goes to this, that our cross-appeal is timely. So just to conclude, we hear from class members every week awaiting distribution of this case. The first complaint was filed 10 years ago this month. We respectfully ask this court to affirm so we may distribute. Thank you. Thank you. Frank? Thank you, Your Honors. I'd like to correct some very bad misstatements of the record that happened. On the Sony appeal, the court did not say it's mitigated by the 9010. It said it was mitigated by the separate representation in the 9010. And the separate representation did not happen for the second tranche when it was pro rata. So there was no mitigation. They came to this court in Seattle in 2019 and argued for affirmance of pro rata distribution against the interests of the repealer state class members. Of course that's a conflict of interest. They tried to take $10 million out of the pockets of repealer state class members that would have gone to them in a 9010 distribution. We are objecting to the percentage of the fund. Higgins Berman said this can be done for 15% and the court awarded 30%. And this was a case that could have produced billions of dollars in damages if they had won. It's because they lost that it settled for only $113 million and that they'll be getting less than Lodestar. But it doesn't mean that 15% is not the ascertainable market rate under Vizcaíno. And we know that because at page 934 of Optical Disc it talks about the proposed bid. It's the proposed bid that's the evidence of the market rate. It's evidence of the ascertainable market. And that's when you depart from the 25% and you use the bid as the starting point. Finally, they misstate the record that the court rejected the bid. The court never rejected the bid. In fact, the court said it never considered the bid. What happened was Higgins Berman withdrew its bid and said, we will collude with the people we are competing against and agree to a single structure. And that's at 3 EER 357 to 59. The court never had an opportunity to say, I'm going to accept the bid or I'm going to reject the bid. And maybe the court would have rejected the bid. But again, it's irrelevant whether the court would have rejected the bid because the bid is evidence. We're not saying the bid stops them from asking for more. We're saying the bid is evidence of what the ascertainable market rate is. I'm happy to answer the court's questions. I don't think there's any further questions, so I appreciate your argument and the arguments of all counsel here. A long-running case, as everybody acknowledges, and hopefully at some point it will come to resolution. So the briefing is very extensive and we appreciate that as well. Case just argued of indirect purchaser plaintiffs versus Bendars is submitted and we're adjourned for the afternoon. Thank you.
judges: HAWKINS, McKEOWN, BYBEE